# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY EDELMAN, | Case No. 1:20-cv-8210 |
| Plaintiff, | |
| vs. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| ROSETTA STONE INC., LAURENCE FRANKLIN, A. JOHN HASS III, AEDHMAR HYNES, PATRICK GROSS, GEORGE LOGUE, DAVID NIERENBERG, KATHRYN EBERLE WALKER, JESSIE WOOLLEY-WILSON, and STEVEN YANKOVICH, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Jeffrey Edelman ("Plaintiff"), by his undersigned attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE AND SUMMARY OF THE ACTION

1. Plaintiff, a stockholder of Rosetta Stone Inc. ("Rosetta Stone or the "Company") brings this action against the Company and the members of its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(d) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Rule 14d-9 promulgated by the U.S. Securities and Exchange Commission (the "SEC"), arising out of material omissions and misstatements made in connection with the merger agreement (the "Merger Agreement") between and among Rosetta Stone and affiliates of Cambium Holding Corp. ("Cambium").

2. On August 31, 2020, Rosetta Stone and Cambium issued a joint press release announcing that the Board had caused Rosetta Stone to enter into the Merger Agreement, pursuant

to which each Rosetta Stone common share issued and outstanding will be converted into the right to receive $30.00 per share in cash (the "Merger Consideration," and the merger proposed, the "Proposed Transaction"). In accordance with the Merger Agreement, Merger Sub commenced a tender offer (the "Tender Offer") to acquire all of Rosetta Stone's outstanding common stock. The Tender Offer will expire on October 13, 2020.

3. On September 15, 2020, Defendants authorized the filing of the Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC designed to convince Rosetta Stone's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained therein. The Recommendation Statement is materially deficient and misleading because, *inter alia*, it fails to disclose material information regarding (i) Rosetta Stone's financial projections relied upon by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), in its financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Goldman Sachs; and (iii) the sale process.

4. The Tender Offer is expected to expire on October 13, 2020. Therefore, it is imperative that the material information omitted from the Recommendation Statement be disclosed to the Company's stockholders prior to the close of the Tender Offer.

5. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction unless and until the material information discussed below is disclosed to Rosetta Stone stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## PARTIES

6. Plaintiff is, and has been at all relevant times, a stockholder of Rosetta Stone.

7. Defendant Rosetta Stone is incorporated in Delaware and maintains its principal offices at 1621 North Kent St., Suite 1200, Arlington, Virginia 22209. The Company's common stock trades on the New York Exchange under the symbol "RST.".

8. Defendant Laurence Franklin has served as a member of the Board since 2006.

9. Defendant A. John Hass III has served as a member of the Board since 2014 and is the Company's Chief Executive Officer and the Chairman of the Board.

10. Defendant Aedhmar Hynes has served as a member of the Board since 2019.

11. Defendant Patrick Gross has served as a member of the Board since 2006.

12. Defendant George Logue has served as a member of the Board since 2018.

13. Defendant David Nierenberg has served as a member of the Board since 2015.

14. Defendant Kathryn Eberle Walker has served as a member of the Board since 2019.

15. Defendant Jessie Woolley-Wilson has served as a member of the Board since 2017.

16. Defendant Steven Yankovich has served as a member of the Board since 2014 and is the Company's Lead Independent Director.

17. The defendants described in ¶¶ 8-16 are referred to herein as the "Individual Defendants."

18. Collectively, Rosetta Stone and the Individual Defendants are referred herein as "Defendants."

## JURISDICTION AND VENUE

19. The claims asserted herein arise under §§ 14(d) and 20(a) of the Exchange Act, 15 U.S.C. § 78aa. The Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

20. Personal jurisdiction exists over each Defendant because each has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play, substantial justice, and under Section 27 of the Exchange Act.

21. Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Rosetta Stone's common stock trades on the New York Stock Exchange, which is headquartered in this District, and Rosetta Stone hired Goldman Sachs as a financial advisor for the purposes of the Proposed Transaction, which is also headquartered in this District, rendering venue in this District appropriate.

## FURTHER SUBSTANTIVE ALLEGATIONS

22. At a regularly scheduled meeting of the Board held November 13-14, 2019, John Hass, Rosetta Stone's Chief Executive Officer and Chairman of the Board, reviewed the Company's potential growth opportunities and challenges, and the Board, in consultation with members of the Company's management team, discussed whether to pursue potential strategic alternatives for the Company.

23. Shortly thereafter, in late 2019, representatives of Party A, a private equity firm with strategic assets, contacted Mr. Hass. On December 11, 2019, Mr. Hass met with representatives of Party A to discuss general updates in the industry. During the course of the meeting, representatives of Party A noted their potential interest in a transaction with the Company if the Company were to consider strategic alternatives.

24. In early January 2020, representatives of Party B, a private equity firm with

strategic assets, contacted Mr. Hass. On January 7, 2020, Mr. Hass met with a representative of Party B to discuss general updates in the industry. During the course of the meeting, the representative of Party B noted their potential interest in a transaction with the Company if the Company were to consider strategic alternatives.

25. Throughout the month of January and through early February, representatives of Goldman Sachs contacted nineteen potential purchasers perceived to be interested in a purchase of the whole Company (a "Whole Company Transaction"), and twenty-one potential purchasers perceived to be well-suited to a purchase of Rosetta Stone's Language business (a "Language Business Transaction"). Thirteen of the potential purchasers perceived to be interested in a Whole Company Transaction entered into confidentiality agreements with the Company, and twelve of these parties attended management presentations given by the Company. Nine of the potential purchasers perceived to be well-suited to a Language Business Transaction entered into confidentiality agreements with the Company and were provided access to a tailored Language business confidential information memorandum.

26. During February and early March 2020, representatives of Goldman Sachs and management of the Company met, telephonically and in person, with representatives of the thirteen potential purchasers perceived to be interested in a Whole Company Transaction that executed confidentiality agreements, including with representatives of Party B on February 5, 2020, Party A on February 10, 2020, and Cambium, a private equity firm with strategic assets, on February 21, 2020. During each set of management meetings, the Company provided each potential purchaser with a management presentation and discussed the potential process and timeline for executing a Whole Company Transaction.

27. Over the next several weeks, members of the Company's management team and

representatives of Goldman Sachs met telephonically and in person with representatives of eleven of the potential purchasers that executed confidentiality agreements, including with representatives of Party A, Party B, Party G and Cambium on the weeks of February 17, 2020, February 24, 2020, and March 2, 2020, to discuss financial models and certain diligence materials.

28. On March 5, 2020, the Company received initial indications of interest from four potential purchasers interested in a Whole Company Transaction, including Party B and Party A, and from three potential purchasers interested in an acquisition of the Literacy and K-12 Language businesses (the "K-12 Business"), including Cambium. The Whole Company Transaction indications ranged from $18.00 per share to $22.50 per share of Rosetta's common stock. The K-12 Business indications ranged from $300 million to $350 million.

29. On March 7, 2020, the Company received an additional initial indication of interest from Party G for a Whole Company Transaction at a value of $17.50 per share of Rosetta's common stock.

30. On March 23, 2020, the Board, in consultation with members of the Company's management team and representatives of Goldman Sachs, determined to pause the strategic alternatives process in light of the Company's need to focus on employees and customers during the ongoing Covid-19 pandemic.

31. On May 21, 2020, the Company received a letter from Voss Capital, LLC ("Voss Capital"), which beneficially owned 5.9% of the Company's outstanding shares, recommending, among other things, that the Board explore strategic alternatives, including a sale of the Company.

32. On June 29, 2020, acting at the direction of the Board, representatives of Goldman Sachs began contacting the representatives of selected potential purchasers engaged in the strategic alternatives process prior to the Company's determination to pause the process to

reconfirm their interest. These discussions were with representatives of six potential purchasers interested in a Whole Company Transaction or K-12 Business transaction and two potential purchasers interested in a Language Business Transaction. Thereafter, on July 6, 2020, these eight potential purchasers were provided access to a confidential electronic data room (the "Data Room") with more detailed due diligence information.

33. Over the following weeks, representatives of Goldman Sachs also contacted or engaged with nine new potential purchasers perceived to be interested in a Whole Company Transaction, seven of which entered into confidentiality agreements with the Company (including Party F), and six new potential purchasers perceived to be interested in a Language Business Transaction, five of which entered into confidentiality agreements with the Company.

34. Between June 30 and July 6, 2020, representatives of Goldman Sachs and management of the Company met telephonically with representatives of five potential purchasers interested in a Whole Company Transaction or Language Business Transaction, including with representatives of Cambium and Party A on July 1, 2020 and Party B on July 6, 2020, and with representatives of two potential purchasers interested in a Language Business Transaction, including with representatives of Party E on July 2, 2020.

35. Throughout July 2020, the potential purchasers reviewed due diligence materials and conducted over sixty-five due diligence calls with management.

36. Beginning on July 9, 2020, Goldman Sachs sent bid instruction letters to active potential purchasers requesting such parties to submit updated, non-binding written proposals by July 30, 2020.

37. On July 10, 2020, the Company received a preliminary indication of interest from Party E for a Language Business Transaction based on limited diligence of $50 million -

$70 million.

38. On July 30-31, 2020, the Company received non-binding proposals from three potential purchasers interested in a Whole Company Transaction, including Party A at $20.50 per share, Party B at $21.00 per share, and Party F at $25.00 per share, which proposal from Party F was subsequently withdrawn. The Company also received non-binding proposals from Cambium and Party B to acquire the K-12 Business in deals valued at $400 million and $375 million, respectively. The Party A proposal included a full mark-up of the merger agreement, a willingness to execute a definitive agreement immediately and a draft exclusivity agreement requesting exclusivity until 11:59 p.m. Eastern Time on August 5, 2020. Though the Company did not receive a proposal from Party D, representatives of Party D expressed a continued interest in a potential transaction with the Company.

39. After reviewing these proposals at a special meeting of the Board on July 31, 2020, the Board directed Goldman Sachs to contact each of Cambium, Party A, Party B, Party D, and Party F to inform them that the Board had authorized the Company to continue the sale process with them, including by providing them with final due diligence information, with a view to the potential purchasers providing final bids in the following weeks.

40. Up until this point, Cambium's interest in a transaction had been in the K-12 Business only. However, on August 3, 2020, Goldman Sachs provided Cambium with the opportunity to pair with Party D who was interested in a Language Business Transaction, as a way to compete with the Whole Company Transaction bidders.

41. On August 7, 2020, Cambium indicated to representatives of Goldman Sachs that they were declining a partnership with Party D and had decided to pursue a Whole Company Transaction.

42. On August 27, 2020, the Company received updated proposals for a Whole Company Transaction from Party A at $26.75 per share and Cambium at $26.50 per share. Though Party B continued to perform diligence and analysis, the Company did not receive a final proposal from Party B.

43. The following day, representatives of Goldman Sachs contacted representatives of Party A and Cambium to explore whether such parties could increase their respective offer and submit a best and final proposal by 12:00 p.m. Eastern Time on August 29, 2020. Party A and Cambium were told that they were one of two final parties remaining in the process and that their offers were at that time undifferentiated versus one another in terms of both price and terms.

44. On August 29, 2020, the Company received final proposals for a Whole Company Transaction from Party A at $28.05 per Share and Cambium at $30.00 per Share.

45. On August 29, 2020, the Board held a special meeting to review the terms of the final proposals from Party A and Cambium. During the meeting the Board authorized Company management to enter into an exclusivity agreement with Cambium to facilitate continued negotiations on the terms of the Merger Agreement. Subsequently, the Company and Cambium entered into an exclusivity agreement for a period of twenty-four hours.

46. Later that same day, the Board reconvened to review the final draft of the Merger Agreement. During the meeting, Goldman Sachs reviewed with the Board Goldman Sachs' financial analysis of the $30 per share offer price from Cambium (the "Offer Price"), and rendered to the Board an oral opinion that the Offer Price to be paid to Cambium stockholders was fair, from a financial point of view, to such holders. Following such presentations, the Board unanimously: (i) determined that the Proposed Transaction and the other transactions contemplated by the Merger Agreement are fair to, and in the best interests of, the Company's stockholders; (ii)

authorized and approved the execution, delivery and performance of the Merger Agreement by the Company; (iii) declared that the Merger Agreement is advisable; (iv) resolved to recommend that the stockholders of the Company tender their shares pursuant to the Tender Offer; and (v) elected to enter into the Merger Agreement and consummate the transactions contemplated by the Merger Agreement pursuant to Section 251(h) of the DGCL. Later on August 29, 2020, the Company, and Cambium executed the Merger Agreement.

47. On August 31, 2020, the Company issued a press release announcing the Proposed Transaction. The press release read in relevant part:

> Arlington, VA, Aug. 31, 2020 (GLOBE NEWSWIRE) – Rosetta Stone Inc. (NYSE:RST) ("Rosetta Stone" or the "Company"), a world leader in technology-based learning solutions, today announced that, following a comprehensive process, it has entered into a definitive agreement to be acquired by Cambium Learning Group ("Cambium"), a leading provider of digital education solutions and a portfolio company of Veritas Capital ("Veritas"). Cambium will acquire Rosetta Stone in an all cash transaction for $30 per share, representing an equity value of approximately $792 million, and a premium of approximately 87.5% to Rosetta Stone's unaffected closing price on July 16, 2020, the last trading day before a media report was published speculating about a potential sale process.
>
> The Board of Directors of Rosetta Stone unanimously approved the transaction with one director not participating due to a potential interest in the transaction. The companies anticipate completing the transaction in the fourth quarter of 2020, subject to the satisfaction of customary closing conditions.
>
> Founded in 1992, Rosetta Stone's language division uses innovative digital solutions to help all types of learners read, write, and speak more than 30 languages. Under its iconic brand, Rosetta Stone provides technology-based language solutions to individual customers, schools and businesses globally. Lexia Learning, Rosetta Stone's literacy education division, was founded more than 35 years ago and is a leader in the literacy education space. Today, Lexia helps students build reading and oral language skills through its rigorously researched, independently evaluated, and widely respected instruction and assessment blended-learning programs. Solutions include Lexia® Core5® Reading (online differentiated literacy instruction for students of all abilities in grades pre-K-5), Lexia® PowerUp® Literacy (online solution to help struggling readers in grades 6-12 become proficient readers and confident learners), Rosetta Stone® English (online blended solution to build oral language skills in emergent bilinguals), and Lexia® Rapid™ Assessment (research-based, computer-adaptive reading and

language assessment).

With a portfolio of award-winning brands, Cambium's digital and blended curriculum, professional learning, and assessment solutions drive proficiency, equity and other learning outcomes in classrooms everywhere. The addition of the Lexia and Rosetta Stone product lines further enhances Cambium's highly unique continuum of digital products. Cambium is backed by Veritas Capital, a leading investment firm with deep industry expertise and over two decades of experience investing in companies that provide critical products and services to government and commercial customers worldwide.

John Hass, Chairman and Chief Executive Officer of Rosetta Stone, said, "This transaction represents the next step on a path that, over the past several years, has transformed our language business and built a previously small K-12 software business into a growing leader in education technology. As part of Cambium, we will have the scale and resources to fulfill our mission and to further leverage the strength of our outstanding team to continue building and delivering technology-based solutions that support the ability to change learners' lives through language and literacy education. I am especially grateful for the incredible dedication of our global team who, in a difficult environment this year, transitioned smoothly to delivering high-quality learning at home for students and adults."

"Cambium continues to thoughtfully curate a portfolio of only the best learning brands," said John Campbell, Chief Executive Officer of Cambium. "With the significant addition of Rosetta Stone, including Lexia Learning, we are now able to deliver even more expansive solutions to teachers, administrators, and learners everywhere, and offer a continuum of best-in-class digital solutions that deliver personalized instruction. The team at Rosetta Stone is truly exceptional and I look forward to working together to grow their already-impressive leadership position."

"The acquisition of Rosetta Stone brings highly strategic products and intellectual property to Cambium's market-leading family of brands," said Ramzi Musallam, Chief Executive Officer and Managing Partner of Veritas. "We look forward to Cambium's continued investment in its award-winning product portfolio, and are thrilled to be partnering with Rosetta Stone's talented employees as we advance our collective mission of improved learning outcomes through differentiated technology solutions."

48.     Thereafter, on September 15, 2020, Cambium commenced the Tender Offer and the Company filed the Recommendation Statement with the SEC. The Tender Offer is currently scheduled to close on October 13, 2020.

**The Recommendation Statement Misleads Rosetta Stone Stockholders by Omitting Material Information**

49. In seeking to convince the stockholders of Rosetta Stone to tender their shares in support of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Recommendation Statement with the SEC on September 15, 2020. Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Recommendation Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction.

50. Specifically, as discussed below, the Recommendation Statement omits material information regarding the sale process, the Company's financial projections, and the valuation analyses performed by Goldman Sachs, the disclosure of which is material because it provides stockholders with a basis to project the future financial performance of Rosetta Stone, and allows stockholders to better understand the analyses performed by the financial advisor in support of its fairness opinion of the Proposed Transaction. If disclosed, this information would significantly alter the total mix of information available to Rosetta Stone's stockholders.

*Material Omissions Concerning the Projections for the Combined Company and the Financial Analyses*

51. The Recommendation Statement describes the financial advisor's fairness opinion and the various valuation analyses the financial advisor performed in support of its opinion. However, the description of the financial advisor's fairness opinion and the underlying analyses omit key inputs and assumptions. Without this information, as described below, Rosetta Stone's public stockholders are being misled as to what weight, if any, to place on the financial

advisor's fairness opinion in determining whether to tender their shares. This omitted information, if disclosed, would significantly alter the total mix of information available to Rosetta Stone's stockholders, and its absence renders the description of Goldman Sach's fairness opinion misleading.

52. As noted in the Recommendation Statement, in connection with the rendering of the fairness opinion, the Company prepared certain non-public financial forecasts (the "Projections") and provided them to the Board and the financial advisor.

53. This unaudited projected financial information included the January 2020 Projections, February 2020 Update, June 2020 Update, July 2020 Update, August 2020 Projections, and the final August 2020 10-year Projections. These Projections included values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: (a) Adjusted EBITDA; (b) Bookings-Based Adjusted EBITDA; and (c) Unlevered Free Cash Flow as calculated by Goldman Sachs. However, the Complaint fails to disclose: (i) the line items used to calculate the non-GAAP measures or (ii) a reconciliation of these non-GAAP metrics to their most comparable GAAP measures.

54. With respect to Goldman Sachs' Implied Premia and Multiples Analysis, the Recommendation Statement fails to disclose: (i) the total number of fully diluted shares of Rosetta Stone's common stock outstanding as of August 21, 2020; and (ii) Rosetta Stone's net cash as of June 30, 2020.

55. With respect to Goldman Sachs' Illustrative Present Value of Future Share Price Analysis, the Recommendation Statement fails to disclose: (i) Goldman Sachs' basis for applying an enterprise value to next twelve months' revenue multiples of 2.0x to 3.0x to estimates of the Company's revenue for each of the fiscal years 2021 to 2023; (ii) the Company's net cash as of

December 31 for each of fiscal years 2020 to 2022; (iii) the Company's projected fully diluted weighted average shares outstanding for each of the fiscal years 2020 to 2022; and (iv) the inputs and assumptions underlying applying the discount rate of 10.2%.

56. With respect to Goldman Sachs' Selected Publicly Traded Companies Analysis, the Recommendation Statement fails to disclose the individual multiples and financial metrics for the companies observed by Goldman Sachs.

57. With respect to Goldman Sachs' Illustrative Discounted Cash Flow Analysis, the Recommendation Statement fails to disclose: (i) the basis for applying the range of discount rates from 10.0% to 12.0%; (ii) the basis for applying a range of perpetual growth rates of 1.75% to 2.75%; (iii) the range of illustrative terminal values of the Company; (iv) the Company's unlevered cash flows used in the analysis; (v) the number of fully diluted outstanding shares of the Company as of August 21, 2020; (vi) the Company's net operating loss tax attributes as of June 30, 2020; and (vii) the Company's net cash as of June 30, 2020.

58. With respect to Goldman Sachs' Selected Transactions Analysis, the Solicitation Statement fails to disclose Goldman Sachs' basis for selecting a reference range of EV/NTM Revenue multiples of 2.7x to 3.9x.

59. With respect to Goldman Sachs' Premia Analysis, the Solicitation Statement fails to disclose: (i) the transactions observed by Goldman Sachs in the analysis; and (ii) the premiums paid in the transactions.

60. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Accordingly, the omissions related to the financial projections are vital to Rosetta Stone stockholders to evaluate

both the Proposed Transaction and Rosetta Stone's future as a standalone entity.

*Material Omissions Concerning the Sales Process leading up to the Proposed Transaction*

61. The Recommendation Statement fails to disclose material information related to the confidentiality agreements Rosetta Stone signed with numerous parties.

62. Specifically, the Recommendation Statement states that Rosetta Stone executed confidentiality agreements with numerous parties, but fails to disclose whether such agreements contained a standstill agreement and/or a "don't ask, don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect.

63. Any reasonable stockholder would deem the fact that likely bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information. However, the Recommendation Statement fails to disclose the details of any confidentiality agreements executed between Rosetta Stone and other potentially interested parties. The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed confidentiality agreements could have made a superior proposal. However, if those confidentiality agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the descriptions of the confidentiality agreements the Company entered into in the Background of the Merger section of the Recommendation Statement misleading.

64. Based on the foregoing disclosure deficiencies in the Recommendation

Statement, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Rosetta Stone stockholders will suffer, absent judicial intervention, if Rosetta Stone's stockholders are required to decide whether to tender their shares without the above-referenced material misstatements and omissions being remedied. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention

## CLAIMS FOR RELIEF

## COUNT I

**Individual Claims Against All Defendants for Violations of § 14(d)(4) of the Securities Exchange Act of 1934 and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)**

65. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

66. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

67. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

68. The Recommendation Statement violates § 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

69. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while defendants had full and unfettered access to and/or actually reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation

Statement, rendering certain portions of the Recommendation Statement so materially incomplete as to be materially misleading.

70. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT II

### Individual Claims Against All Defendants for Violations of § 20(a) of the 1934 Act Against the Individual Defendants

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. The Individual Defendants acted as controlling persons of Rosetta Stone within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Rosetta Stone and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

73. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

74. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control and influence the particular transactions giving rise to the violations as alleged herein and exercised the same. The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the preparation and issuance of the Recommendation Statement.

75. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

76. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d)(4) of the 1934 Act and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

a) declaring that the Recommendation Statement is materially false or misleading;

b) enjoining, preliminarily and permanently, the Proposed Transaction;

c) in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

d) directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

e) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

f)   granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 2, 2020                                              Respectfully submitted,

| | |
|---|---|
| **LEVI & KORSINSKY, LLP** | By: /s/ *Sebastiano Tornatore* |
| Donald J. Enright (to be admitted *pro hac vice)* | Shannon L. Hopkins (SH-1887) |
| Elizabeth K. Tripodi (to be admitted *pro hac vice)* | Sebastiano Tornatore (ST-0304) |
| 1101 30th Street, N.W., Suite 115 | **LEVI & KORSINSKY, LLP** |
| Washington, DC 20007 | 1111 Summer Street, Suite 403 |
| Tel: (202) 524-4290 | Stamford, CT 06905 |
| Fax: (202) 333-2121 | Tel.: (203) 992-4523 |
| Email: denright@zlk.com | Fax: (202) 333-2121 |
|         etripodi@zlk.com | Email: stornatore@zlk.com |
| | shopkins@zlk.com |
| *Attorneys for Plaintiff* | |
| | *Attorneys for Plaintiff* |